**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**


Timothy W. Hazelton, Sr.


        v.                                    Civil No. 08-cv-419-JL


William Wrenn, Commissioner,
New Hampshire Department of
Corrections, et al.[1]


**REPORT AND RECOMMENDATION**


        Timothy Hazelton brought this action, pursuant to 42 U.S.C.
§ 1983, complaining that his Eighth Amendment right to humane
conditions of confinement have been violated by defendants
(document no. 1).[2]  Upon preliminary review of this matter, I
construed the complaint as containing a request for preliminary
injunctive relief.  The matter was referred to me (document no.

---

        [1]In addition to Wrenn, Hazelton names New Hampshire
Department of Corrections Deputy Commissioner Christopher Kench
and Northern New Hampshire Correctional Facility employees Cpl.
Shane Mailhot, Librarian Angela Poulin, Corrections Officer
("C.O.") Timothy Overhoff, C.O. Lemieux, C.O. Trevor Dube, Unit
Manager Robert Thyng, C.O. Walter Westbury, Cpl. Edward
MacFarland, and Warden Larry Blaisdell as defendants to this
action.

        [2]I further construed the action as alleging a violation of
Hazelton's rights under the Americans with Disabilities Act, 42
U.S.C. 12132, et seq. ("ADA").

5), and a hearing was held before me on Hazelton's request for a preliminary injunction on November 20 and 21, 2008.[3]  For the reasons explained herein, I recommend the issuance of an injunction requiring the defendants to, except in the event of an institutional emergency or other exceptional circumstance: (1) insure that Hazelton have access to the nearest inmate bathroom no more than five minutes after he requests the use of a bathroom, whether for urination or defecation, (2) insure that Hazelton can immediately return to any activity or visit interrupted by his use of the bathroom, even if returning to that activity or visit means that Hazelton must travel from his unit to his activity or visit outside of a scheduled "movement" time, and (3) insure that Hazelton will not be harassed, mistreated, or subject to any negative consequences as a result of his bathroom needs or requests.

---

[3]Hazelton has submitted a document to the Court entitled "Closing Argument" (document no. 12).  It appears from that document that Hazelton believes that the hearing held was, in fact, a trial on his underlying action.  It was not.  I have directed that his underlying action proceed, but that action has not yet been tried.  The only matter for consideration before this Court at this time is whether or not the defendants should be subject to an Order of this Court regarding Hazelton's access to the bathroom during the pendency of this matter.

<u>Background</u>

Timothy Hazelton is a forty-six year old inmate at the Northern New Hampshire Correctional Facility ("NCF"), where he has been housed by the New Hampshire Department of Corrections ("NHDOC") since February 23, 2006.  Hazelton suffers from an enlarged prostate and from irritable bowel syndrome.  As a consequence of his medical issues, Hazelton has to urinate and defecate more frequently than the average person, and when he feels the urge to either urinate or defecate, he is not able to "hold it," but must get to a bathroom right away in order to avoid soiling his clothing.

When Hazelton arrived at NCF, he fully apprised medical personnel there of his medical issues, including his bathroom-related needs.  Judy Baker, a nurse practitioner on the NCF medical staff, subsequently issued him a permanent "medical pass," which advises NCF staff of his medical needs and entitles him to a waiver of certain prison policies and procedures, to the extent they interfere with his ability to use the bathroom as necessitated by his medical conditions.  Specifically, the passes issued to Hazelton direct prison staff that he is to be allowed to use the bathroom when needed without

terminating his activities or visitation when they are
interrupted by his bathroom needs.

Evidence at the hearing came from a number of witnesses,
including Hazelton, NCF Major Dennis Cox, Baker, NCF C.O.s Masse,
Westbury, Dube, Overhoff, NCF Media Generalist Angela Poulin, NCF
Cpl. Shane Mailhot, NCF Sgt. Edward McFarland, Jr., NCF Unit
Manager Robert Thyng, and NCF inmates Andrew Parker, Richard
Castine, Kerry Kidd, Christopher Cremeans, Alexander Gagnon, Jr.,
and Mark Holt.[4]  A number of exhibits were also accepted in
evidence at the time of the hearing.  Based on the evidence
presented, I find the relevant facts as follows.

Hazelton has two serious medical conditions, irritable bowel
syndrome and an enlarged prostate, which are known to the NCF
staff.  Baker testified that, on average, Hazelton would likely
be able to wait five minutes before his need to void or defecate
would overcome his ability to control those functions.  Baker

---

[4]Both plaintiff and defendants have submitted post-hearing
pleadings outlining their summations on the question of whether
or not a preliminary injunction should issue in this matter
(document nos. 12 – 15).  Both plaintiff and defendants have
presented additional factual information in these pleadings that
they did not present at the hearing.  I will not accept new
evidence at this time that is not subject to cross-examination.
Even if accepted, however, the factual information presented in
the post-hearing pleadings would not alter my determination of
this matter.

testified that in some circumstances, this time period could be
slightly more or less than five minutes.  Baker also testified
that this is not a condition Hazelton relishes and that he is
working with the NCF medical department as well as a urologist to
find a treatment or medication that might alleviate or ameliorate
the symptoms at issue here.

<u>Evidence Concerning Visiting Room</u>

Hazelton testified that he receives approximately three
visits a year, and that his family has to travel several hours to
see him.  He further testified that on one or more occasions, he
was forced to choose between early termination of his visits and
defecating in his clothing.  While Hazelton appears to have
chosen to terminate his visits early most of the time, he stated
that on at least one occasion he defecated in his clothing during
his visit, because he was not allowed to use the inmate bathroom
and did not want to return to his unit and terminate his visit.

Witnesses Masse and Westbury testified that NCF security
regulations allow inmates to use the inmate bathroom located near
the visiting room, but only to urinate.  If an inmate needs to
defecate during a visit, he must either wait until the end of the
visit, or terminate his visit and return to his housing unit to

use the toilet there.  Westbury specifically testified that he
would not alter this procedure, even if an inmate possessed a
medical pass directing him to allow the visits to continue after
the inmate is allowed to use the bathroom.

The justification offered by defendants' witnesses for the
visiting room bathroom policy is that inmate visitation provides
an opportunity for inmates to receive contraband from visitors,
and that such contraband might be placed by an inmate into his
own rectum if he were allowed to use the bathroom in the visiting
area to defecate.  The officers testified that for an inmate to
use the bathroom to urinate, an additional officer has to be
called to the visit room to accompany the inmate to the bathroom.
The inmates enter the bathroom and, it appears, an officer stands
outside.  What prevents a urinating inmate from inserting
contraband into his rectum while urinating is unclear, although
the officers seemed to think that was unlikely to occur while an
inmate was standing up to urinate.  None of the officers
testified as to whether any other measures, such as stationing an
officer inside the bathroom while an inmate defecates, or having
an officer conduct a search of an inmate prior to allowing him to

defecate, would impose any sort of undue burden on the institution or would undermine institutional security efforts.

The officers testified that inmates undergo a strip search prior to returning to their housing unit after a visit.  No cavity searches are routinely conducted, although there is a procedure available for conducting such a search.  Specifically, a cavity search must be authorized, and a nurse or other medical professional must be contacted to conduct the search.  While a cavity search clearly imposes a greater burden on the institution than a non-cavity strip search, it is unclear whether such a search would be unduly burdensome if conducted only on Hazelton on those occasions when he needs to defecate during a visit.  Any burden the accommodation might place upon the institution is minimal compared to the benefit to Hazelton, who would, if accommodated, be able to fully enjoy his visitation time with his family.

Testimony from the visitation room officers also included speculation that, were Hazelton allowed to use the inmate bathroom in the visitation room to defecate, he would be targeted by other inmates to be a "mule."  Specifically, the officers expressed concern that inmates would pressure Hazelton to smuggle

contraband in his rectum for them from people in the visitation area.  While I believe this concern is legitimate, it is also speculative.  The officers presented no testimony that this has actually occurred, or that no other adequate means, such as cavity searches for inmates who have defecated in the inmate visiting room bathroom or strip searches conducted prior to bathroom use, exist.  This concern was also undermined by the fact that one of the officers testified that on several occasions he had allowed inmates to defecate in the inmate visitation area bathroom.

While the officers testified that an early termination of a visit by an officer would generate a report, and that no such report existed for Hazelton, the testimony also revealed that if an inmate voluntarily terminated his visit in order to return to his housing unit to defecate, that no report would be generated. Accordingly, there is no written record available to either prove or disprove Hazelton's account of events in the visitation room.

I find, that there is no reason to disbelieve Hazelton's testimony regarding what has occurred during his visitation. Hazelton testified credibly and, I believe, quite openly about embarrassing and humiliating events.  Additionally, Hazelton's

testimony on this point was corroborated by Mark Holt, Hazelton's cellmate at NCF.  Holt testified that on one occasion he actually saw Hazelton return to his cell with his clothing soiled as a result of not being able to reach a bathroom in time. Additionally, Holt testified that he was aware of other occasions when Hazelton had soiled his clothing, disposed of it on his own, and reported the clothing lost in the laundry.

Hazelton's testimony regarding his experiences in the visitation room was not adequately countered by the correctional officers, who could only state that they did not recall Hazelton being forced to choose between his family visit and using the bathroom, and that they were not aware of any instance in which Hazelton defecated in his clothing during a visit.  The officers' testimony that Hazelton was not provided with any special consideration for his medical condition, considered in conjunction with Nurse Baker's testimony regarding the effects of those conditions, actually strengthen Hazelton's testimony that he was forced to choose between risking defecating in his pants and cutting his visits short.

Evidence Concerning Education Department at NCF

The NCF Education Department ("ED") includes the institution's chapel, classrooms, and libraries.  Hazelton works in the chapel five mornings a week, Monday through Friday, for approximately three and a half hours a day.  Hazelton also regularly visits the chapel on all days of the week for religious services.  Hazelton attends classes and piano lessons in the ED, and uses the law library as necessary.  The ED is equipped with two inmate bathrooms which are kept locked at all times, except between 9:00 and 9:30 each morning when they are cleaned.  Cpl. Mailhot is the officer in charge of the ED and its security.  In that capacity, he is the person to whom a request to use the bathroom, and to unlock the bathroom first, must be made. Inmates do not have unimpeded access to bathrooms in the ED, but must request that the bathrooms be unlocked or, in the event that the bathrooms are already unlocked for cleaning, must alert NCF staff that they are going to use the bathroom.

Hazelton alleges that the NCF staff members who work at NCF generally and in the ED specifically, and named as defendants to this action, have not allowed him to use the bathroom as necessary.  Instead, defendants have significantly delayed

granting, or altogether denied, his requests to use inmate bathrooms, or effectively terminated his activities in the ED if he has to return to his housing unit to use the bathroom during those events.  Hazelton testified that he and other inmates often have to wait fifteen minutes to use a bathroom, and that it is not uncommon for an inmate to have to wait thirty to forty minutes or more for Mailhot to unlock an inmate bathroom in the ED.  Hazelton also testified that he is rarely allowed to use the bathroom more than once a morning, and never more than twice. Hazelton stated that frequent inmate requests to use the bathroom "upset" Mailhot.  Sometimes, Hazelton testified, Mailhot simply denies him the use of the bathroom in the ED, requiring him to return to his housing unit  to use the bathroom prior to completing his activity.

Hazelton is then prevented from returning to the ED to complete his activity unless he happens to use the housing unit bathroom during a "movement" period, when inmates are permitted to move to different locations within the institution.  Such movements occur for ten minutes once, or sometimes twice during an hour.  Accordingly, returning to his housing unit to use the bathroom often results in Hazelton being unable to return to

chapel services, being forced to terminate his class or lesson early, or being made to leave the library before his work there is done.

Mailhot testified at the hearing that it takes approximately three to four minutes to respond to an inmate's request to use an inmate bathroom, and that no inmate has ever had to wait longer than that to use a bathroom on his watch.  Mailhot further testified that he has never limited the number of times a day an inmate can use the inmate bathrooms in the ED, and has never required an inmate to leave the ED and return to his housing unit to use the bathroom.  Mailhot testified that he had only required Hazelton to leave work and go to his housing unit once, and that was due to Hazelton being ill that day.

In addition to Mailhot, Hazelton reports that on at least one occasion, he was prevented from timely use of the inmate bathrooms in the ED by Angela Poulin, NCF's librarian, who questioned him as to why he had to use the bathroom and, when he explained his medical pass, Poulin became irritated, summoned Mailhot, and advised him that Hazelton was giving her a hard time.  Mailhot sent Hazelton back to his housing unit to use the

bathroom, causing Hazelton to terminate his trip to the library, where he was waiting for legal copies to be made.

Mailhot testified that he had no memory of this incident. Poulin testified that she did have a conversation with Hazelton in the library about bathroom use.  While Poulin did not remember specifics of the conversation, she said she follows a security-based policy that prohibits inmates from using the bathrooms in the ED unless they are in the library for more than two hours. Poulin stated that, because plaintiff claimed that he had medical issues and needed to use the bathroom for that reason, she referred him to Mailhot.  Poulin testified she did not recall being upset by Hazelton's behavior during this incident, and that she did not write a disciplinary incident report regarding this incident.

Hazelton reported that other officers participate in making this an ongoing issue and problem for inmates, particularly those with medical needs that cause them to use the bathroom more frequently than average, or with more urgency than average. Hazelton names NCF officers Dube, Westbury, Overhoff, and Lemieux as participating in creating and maintaining impediments to adequate bathroom use for himself and other inmates.

13

Several inmates other than Hazelton testified to counter Mailhot's assertion that no one ever waited more than a few minutes to use the bathroom in the ED, or was denied the use of a bathroom at the ED and instead sent back to their unit. Inmate Kerry Kidd stated that he too has been refused bathroom use by Mailhot in the ED, and that he has had to wait up to forty minutes for Mailhot to unlock the bathroom while he was using the law library. Kidd further testified that even though he had complained to the NCF Warden in writing and at an inmate-warden meeting, the situation had not improved. Kidd stated that he had stopped going to the library or spending any length of time in the ED at all, when possible, in order to avoid the "headache" of obtaining access to a bathrooms there. Kidd also testified he had seen other inmates wait for more than a few minutes to use the bathroom in the ED. In the library in particular, Kidd stated, delays in gaining access to a bathroom are significant, as an inmate first must notify Poulin that he needs a bathroom, who then notifies Mailhot, who then "takes his time" in opening the bathroom. Kidd stated that instead of waiting for a bathroom to be opened, he has opted in the past to cut his library time short in order to return to his housing unit on a movement.

14

Inmate Alexander Gagnon testified that he has prostate cancer and, therefore, has to use the bathroom with some frequency. He also goes to the chapel frequently. Gagnon testified that on at least three occasions Mailhot refused to let him use the bathroom if he requested to go more than once during a visit to ED. Instead, Mailhot would send him to his unit, preventing him from returning to the chapel because it was not a movement period. In order to avoid missing religious services, Gagnon testified he has waited for Mailhot to unlock the door for up to an hour, and once waited for two and a half hours. Gagnon testified that although it causes him to miss time in the chapel, he often returns to his housing unit to use the bathroom because it is easier than waiting for Mailhot to open a bathroom.

Inmate Andrew Parker testified that he is diabetic and takes water pills, which causes him to have to use a bathroom frequently. Although Parker advised Mailhot of his medical condition, he has had to wait for up to forty-five minutes for Mailhot to unlock a bathroom for him, and that twice Mailhot denied him the use of an inmate bathroom in the ED and sent back to his housing unit to use the bathroom there instead. Parker reports he has had to leave his GED class to go to his housing

15

unit to use the bathroom.  Parker reports that Mailhot told him that if he had medical problems, he should just stay on his unit and not come to the ED.  Parker stated that he would attend more chapel activities if it were not for the difficulties he has faced gaining access to the ED bathrooms.  Parker also testified to having seen Hazelton being made to wait more than a few minutes for the bathroom, and being denied access to the ED bathrooms.

After considering the testimony of all of the witnesses, as well as the evidence presented, I find that neither Mailhot nor Poulin presented credible testimony in this matter, particularly with regard to the issue of inmates' access to bathrooms in the ED.  I find that the testimony proffered by Hazelton and the other inmate witnesses on this topic was consistent and worthy of belief.

Hazelton testified that on weekends, while in the chapel attending services, he often needs to use the bathroom.  Hazelton has to ask an official to open the inmate bathroom near the chapel so that he does not have to return to his housing unit and miss the services.  On February 24, 2008, Cpl. McFarland was summoned to the chapel area to unlock the bathroom for Hazelton.

McFarland responded, but refused to open the bathroom, first because it was not a movement time, and then because it was too busy during movement.  Hazelton had to return to his housing unit to use the bathroom, but, on that occasion, returned to the chapel for the remainder of his religious service because he was able to use the bathroom before the movement period ended.  After this incident, Hazelton asked a woman who witnessed it to write down McFarland's name for purposes of filing a grievance. McFarland would not let her write his name down for Hazelton. McFarland admitted at the hearing that he told her not to write his name down for Hazelton, as he did not believe that it was necessary.

Hazelton testified he takes piano lessons in the chapel from inmate Richard Castine once a week.  Castine testified that Hazelton nearly always has to use the bathroom during his hour-long lesson, and that Mailhot has refused to unlock the bathroom for him during his lessons, or made him wait for up to fifteen minutes.  Castine has also seen Hazelton forced to miss chapel services to return to his housing unit to use the bathroom.

Unit Manager Robert Thyng testified at the hearing.  At first Thyng admitted he recalled that, while making rounds, he

had had several discussions with Hazelton about his issues with bathroom use.  Thyng then stated, however, that he had never discussed any issues relating to Hazelton's medical pass not being honored, did not recall any specific instances discussed, and that he had no conversations with Hazelton before receiving a grievance on February 24, 2008, that he had no discussion with Hazelton between February 2008 and April 2008, and that he has had no discussions with Hazelton regarding this issue since April 2008.  I find that Thyng's initial admission that Hazelton discussed this issue with him many times, immediately followed by his insistence that they essentially never had discussions on the subject, renders Thyng's testimony incredible.

On May 16, 2008, Hazelton filed a final appeal of the denial of his grievances, by both Thyng and the NCF Warden, with NHDOC Commissioner William Wrenn.  Hazelton reiterated his complaints and stated that he had been unable to resolve these issues with staff, despite repeated efforts to do so.  Specifically, Hazelton complained that, despite his medical condition and his medical pass, NCF staff continued to send Hazelton to his housing unit to use the bathroom, rather than allowing him to use a closer inmate bathroom, and that this resulted in the termination of his

activities and visitation.  Christopher Kench, Wrenn's assistant, responded on behalf of Wrenn.  Kench's response was: "This has been policy and practice for some time now, and we believe that it will withstand discussion."  The testimony at the hearing demonstrated that the NCF defendants followed this policy, which caused them to disregard Hazelton's medical situation and his medical pass.  This has resulted in the denial of educational and religious activities, library usage, and visitation time that Hazelton would have enjoyed were he not afflicted with his particular medical conditions.

Discussion

I.   <u>Standard of Review</u>

Preliminary injunctive relief is available to protect the moving party from irreparable harm, so that he may obtain a meaningful resolution of the dispute after full adjudication of the underlying action.  See <u>Jean v. Mass. State Police</u>, 492 F.3d 24, 26–27 (1st Cir. 2007).  Such a situation arises when some harm from the challenged conduct could not be adequately redressed with traditional legal or equitable remedies following a trial.  See <u>Ross–Simons of Warwick, Inc. v. Baccarat, Inc.</u>, 102 F.3d 12, 18 (1st Cir. 1996) (finding irreparable harm where legal

remedies are inadequate); <u>see</u> <u>also</u> <u>Acierno v. New Castle County</u>, 40 F.3d 645, 653 (3d Cir. 1994) (explaining irreparable harm and its effect on the contours of preliminary injunctive relief). Absent irreparable harm, there is no need for a preliminary injunction.  The need to prevent irreparable harm, however, exists only to enable the court to render a meaningful disposition on the underlying dispute.  <u>See</u> <u>CMM Cable Rep., Inc. v. Ocean Coast Props.</u>, 48 F.3d 618, 620–21 (1st Cir. 1995) (explaining the purpose of enjoining certain conduct as being to "preserve the 'status quo' . . . to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs"); <u>see</u> <u>also</u> <u>Stenberg v. Cheker Oil Co.</u>, 573 F.2d 921, 925 (6th Cir. 1978) ("The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.").

A preliminary injunction cannot issue unless the moving party satisfies four factors which establish the need for such relief.  <u>See</u> <u>Esso Std. Oil Co. v. Monroig-Zavas</u>, 445 F.3d 13, 17–18 (1st Cir. 2006) (discussing the requisite showing to obtain a preliminary injunction); <u>see</u> <u>also</u> <u>Ross-Simons</u>, 102 F.3d at 18–19

(explaining the burden of proof for a preliminary injunction).
Those factors are:  "(1) the likelihood of success on the merits;
(2) the potential for irreparable harm [to the movant] if the
injunction is denied; (3) the balance of relevant impositions,
i.e., the hardship to the nonmovant if enjoined as contrasted
with the hardship to the movant if no injunction issues; and (4)
the effect (if any) of the court's ruling on the public
interest."  Esso Std. Oil, 445 F.3d at 18.  If the plaintiff is
not able to show a likelihood of success on the merits, the
remaining factors "become matters of idle curiosity,"
insufficient to carry the weight of this extraordinary relief on
their own.  See id. (the "sine qua non of the four-part inquiry
is likelihood of success on the merits").  Yet, "the predicted
harm and the likelihood of success on the merits must be
juxtaposed and weighed in tandem."  Ross-Simons, 102 F.3d at 19.
Applying this standard, I will assess plaintiff's claims and
request for injunctive relief.

2.   <u>The Preliminary Injunction Factors</u>

   A.   <u>Likelihood of Success on the Merits</u>[5]

   Hazelton's civil action raises claims alleging that he was

subject to inhumane conditions of confinement in violation of the

Eighth Amendment.[6]  The crux of Hazelton's underlying claims is

that the failure to provide Hazelton with prompt and frequent

access to a nearby bathroom when he needs one violates rights

guaranteed to him by the federal constitution and laws.  While

defendants have interpreted Hazelton's complaint as challenging

three instances where a bathroom was denied, the complaint is

more accurately read to allege an ongoing series of frequent

_____

   [5]In both their objection to the issuance of a preliminary
injunction and their post-hearing memorandum, defendants argue
that Hazelton is unlikely to succeed on the merits of his
underlying claims, in part, because he has failed to demonstrate
complete exhaustion of administrative remedies.  A claim of
failure to exhaust is an affirmative defense.  <u>See</u> <u>Jones v. Bock</u>,
549 U.S. 199, 212 (2006).  At this stage in the proceedings,
where discovery has not yet been conducted and the record is
undeveloped, I decline to require plaintiff to provide further
proof of exhaustion than his submissions to date already
demonstrate.  Further, at the hearing, defendants agreed to
reserve the issue of exhaustion until summary judgment.

   [6]Hazelton's complaint also asserts a claim under the ADA.
Because I find that Hazelton has sufficiently demonstrated
likelihood of success on the merits of his Eighth Amendment
claim, it is not necessary for me to determine whether he is
likely to prevail on his ADA claim for purposes of making a
decision on the preliminary injunctive relief sought.

violations of Hazelton's Eighth Amendment right to humane conditions of confinement, using three instances of such violations of examples.  "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Helling v. McKinney, 509 U.S. 25, 33 (1993); see Giroux v. Somerset County, 178 F.3d 28, 31 (1st Cir. 1999).  Hazelton's claim that he was wrongfully denied access to necessary sanitary facilities implicates the Eighth Amendment's proscription against the imposition of cruel and unusual punishment.

The Supreme Court has adopted a two-part test for reviewing claims under the Eighth Amendment's cruel and unusual punishment clause.  See Farmer v. Brennan, 511 U.S. 825, 834 (1994); Helling, 509 U.S. at 25; Hudson v. McMillian, 503 U.S. 1, 7 (1992).  "First, the deprivation alleged must be, objectively, 'sufficiently serious,' a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'" Farmer, 511 U.S. at 834 (internal citations to Wilson v. Seiter, 501 U.S. 294, 298 (1991), Hudson, 503 U.S. at 5, and Rhodes v. Chapman, 452 U.S. 337, 347 (1981) omitted). "The Constitution 'does not mandate comfortable prisons,' but

23

neither does it permit inhumane ones." <u>Helling</u>, 509 U.S. at 31 (citing <u>Rhodes</u>, 452 U.S. at 349).  The Eighth Amendment imposes duties on prison officials to ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates.  <u>See</u> <u>Farmer</u>, 511 U.S. at 832-33; <u>Hudson v. Palmer</u>, 468 U.S. 517, 526-527 (1984); <u>Helling</u>, 509 U.S. at 31-32; <u>Washington v. Harper</u>, 494 U.S. 210, 225 (1990); <u>Estelle</u>, 429 U.S. at 103.  Conditions of confinement which do not lead to deprivations of essential food, medical care, or sanitation do not amount to an Eighth Amendment violation.  <u>See</u> <u>Williams v. McWilliams</u>, 20 F.3d 465 (5th Cir. 1994) (citing <u>Rhodes</u>, 452 U.S. at 348).

To satisfy the second prong of an Eighth Amendment claim, a prisoner must allege that prison officials "have a 'sufficiently culpable state of mind.'  In prison-conditions cases, that state of mind is one of 'deliberate indifference' to inmate health or safety." <u>Farmer</u>, 511 U.S. at 834 (internal citations omitted). Treating a disabled inmate without regard for "the basic concept of human dignity at the core of the Eighth Amendment," can suffice to create a constitutional violation.  <u>Schmidt v. Odell</u>, 64 F. Supp. 2d 1014, 1031 (D. Kan. 1999) (internal citations

omitted).  This is particularly true where the challenged conditions of confinement "'shock the conscience,' are 'barbarous,' or 'result in a deprivation of the minimal civilized measures of life's necessities.'"  Boland v. Coughlin, 622 F. Supp. 736, 737 (E.D.N.Y. 1985) (citing Rhodes, 452 U.S. at 347)

Here, by demonstrating a pattern of denying him access to necessary sanitary facilities, Hazelton has shown a sufficiently serious deprivation to satisfy the first prong of the Eighth Amendment violation test.  Hazelton has also established that defendants were aware of his medical situation, his need for quick access to a bathroom, and knew he had received a medical pass exempting him from the normal policies of the institution regarding bathroom use by inmates.  Despite this knowledge, the evidence showed that defendants denied him adequate access to toilet facilities, which often either interrupted religious or educational activities he was engaged in, or visits with his family.  Additionally, Hazelton adduced evidence that showed he was denied any modicum of human dignity when he was made to soil himself on the way to the bathroom because he was denied quick access to a nearby bathroom, or was made to soil himself in front of other people, including visiting family members, when he was

refused the use of a nearby bathroom.  While not every defendant admitted to being specifically apprised of the pass, the testimony at the hearing made clear that Hazelton had advised people of his medical situation and his medical needs, including his need to use the bathroom.  Mailhot and others specifically testified that they were made aware of the issue.  Rather than deny knowledge of Hazelton's frequent need for bathroom facilities, defendants simply denied that Hazelton was ever delayed in going to the bathroom or ever refused the use of a nearby bathroom.  This testimony, however, defies credibility. All of the inmates who testified stated that they had experienced and witnessed delays in gaining access to a bathroom in the ED for much longer than the three to four minute wait Mailhot claims to always provide.  Witnesses testified that the wait was frequently fifteen minutes and sometimes was more than two hours. Nurse Baker testified that normally Hazelton would not be able to wait more than five minutes to use a bathroom.  Accordingly, as his need for quick bathroom use was not honored, he would be forced to either soil himself or return to his housing unit.

The defendants all testified that Hazelton's choice to return to his housing unit would essentially terminate the

activity he was involved in as, despite the instructions in his medical pass not to terminate activities for allowing bathroom use, defendants testified they would follow established security procedures.  This evidence is sufficient to demonstrate at this preliminary stage in the proceeding that Hazelton was deprived of adequate sanitary facilities, and that this deprivation falls below the standard of a "minimal civilized measure of life's necessities."  See Rhodes, 452 U.S. 347.  Accordingly, Hazelton has demonstrated that he is likely to succeed on the merits of his Eighth Amendment claim.

      B.    <u>Irreparable Harm</u>

The evidence before the Court demonstrates that, if no injunction is granted, Hazelton will continue to be subject to the inhumane treatment evidenced by the testimony at the hearing. The evidence demonstrated that NCF officials have acted in accordance with what they perceive to be NCF policy, and that they intend to continue to do so without regard for the exceptions or allowances necessitated by Hazelton's genuine and serious medical conditions and required by his medical pass. While I find that Hazelton has not, at this time, demonstrated that he has suffered physical injury as a result of the

defendants' actions, I do find that he has alleged that he is
being subjected to repeated and frequent indignities that are
beneath the level of civilized and non-barbaric conduct to which
the defendants are constitutionally bound to adhere.
Accordingly, I find that this conduct, and continued deprivation
of basic human dignity suffered by Hazelton, is demonstrably
likely to cause irreparable harm if allowed to continue.

        C.    <u>Balance of Hardships</u>

      The injunction Hazelton seeks is an order for defendants to
act in a manner strikingly similar to what the defendants
testified already occurs at NCF.  Defendant Mailhot testified
that (1) inmates are always granted access to the bathroom in the
ED in three to four minutes, without regard to the number of
times they have used the bathroom on a particular day, (2)
inmates are never required to return to their housing units to
avoid a delay in gaining access to an ED bathroom, (3) inmates
are, on occasion, allowed to use the visitation area inmate
bathroom to defecate, and (4) security measures exist that would
assist in preventing the introduction of contraband in visitation
area inmate bathrooms.  While I do not find the defendants'
testimony regarding past events to be credible regarding the

conduct they actually engaged in, I do find credibility in defendants' apparent assertion that adherence to the practices they described would not cause significant hardship to prison operations.  To the extent that increasing security procedures in the visitation area, on occasions when Hazelton uses the inmate bathroom to defecate, would increase the burden on NCF staff, I find that such a burden, given the infrequency of Hazelton's family visits and the existence of established procedures for assuring institutional security, does not outweigh the substantial burden that would be placed on Hazelton by allowing the current inhumane practices to continue.

D.   Public Interest

The public interest is well-served by assuring adherence to the Eighth Amendment prohibition against cruel and unusual treatment that includes subjecting human beings to severe indignities during their incarceration.  There is no public interest served by failing to provide sanitary facilities, as needed, to inmates in accordance with their documented medical needs, without disrupting the inmate's educational, legal or religious activities and practices.  For that reason, I find the public interest weighs in favor of issuance of this injunction.

Conclusion

Because I find that Hazelton is likely to succeed on the merits of his underlying claims, that he will likely be irreparably harmed in the absence of an injunction, that the balance of hardships weighs in favor of the plaintiff, and that the public interest is best served in this matter by granting the requested relief, I recommend that the following injunction issue:

1.    Each of the defendants, and those acting under their direction, are enjoined from denying Hazelton prompt access to the nearest inmate bathroom.  Specifically, absent exceptional or emergency circumstances:

A.    Hazelton must be allowed to use a bathroom within five minutes of a request to do so;

B.    Hazelton must be allowed to use the inmate bathroom closest to him at the time of his request;

C.    Hazelton must be allowed to return immediately to the activity in which he was participating (i.e. library use, chapel work, chapel services, visitation and other educational programming or lessons) upon completion of his use of the

bathroom, whether or not it is a scheduled "movement" time in the institution.

Any objections to this report and recommendation must be filed within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the district court's order.  See Unauthorized Practice of Law Comm. v. Gordon, 979 F.2d 11, 13–14 (1st Cir. 1992); United States v. Valencia–Copete, 792 F.2d 4, 6 (1st Cir. 1986).


*/s/ James R. Muirhead*
James R. Muirhead
United States Magistrate Judge


Date:     December 30, 2008

cc:       Timothy W. Hazelton, pro se
          Danielle Pacik, Esq.